**GOULD, INC., Plaintiff,**

v.

**A&M BATTERY & TIRE SERVICE, et al., Defendants.**

**No. 3:91–CV–1714.**

United States District Court, M.D. Pennsylvania.

Dec. 27, 2001.

John M. Armstrong, Richard A. Barkasy, Schnader, Harrison, Segal & Lewis, Cherry Hill, NJ, for plaintiff.

Donald B. Mitchell, Jr., Deanne M. Ottaviano, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for defendants.

## *MEMORANDUM AND ORDER*

CONABOY, District Judge.

### I

This matter has a long history in this Court and evolves from lead contamination in the area of the Marjol Battery Company, resulting from the crushing and recycling of batteries at its former site in the Borough of Throop, Pennsylvania.

This action was brought to require contribution from Alexandria Scrap Corporation, Lake Erie Recycling Company, R & R Salvage Company and American Scrap Co. which sold batteries to Marjol.

The remaining Defendants in this action were contributors of batteries to the site who appealed this Court's original decision.

The present matter is brought to the Court's attention by way of a summary judgment motion filed on July 11, 2001 on behalf of the three remaining battery suppliers who claim that they are entitled to judgment as a matter of law under the SREA. (Doc.2065).

## II

By way of background, in December 1991, Gould initiated this civil action seeking cost recovery from approximately 240 potentially responsible parties, pursuant to § 107(A)(4)(B) of CERCLA or alternatively, contribution pursuant to CERCLA § 113.

This Court held a Bench Trial on the issue of allocating response costs among those Defendants held liable to Gould for contribution. We held in our September 14, 1997 Memorandum and Order that "Gould should bear 75% of the cleanup costs and that the Defendants should bear the remaining 25%..." See *Gould v. A & M Battery, et al.,* 987 F.Supp. 353 (M.D.Pa.1997). This Court then apportioned the Defendants' 25% share according to the amount of waste each contributed to the Marjol site.

Subsequent to that decision, Gould settled with a large number of the Defendants, with the exception of four appellants. Those four parties filed an appeal to the United States Court of Appeals for the Third Circuit Court. After the appeal had been filed, Congress passed and the President signed the Superfund Recycling Equity Act ("SREA"). In short, on November 29, 1999, President Clinton signed into law the new Superfund Recycling Equity Act, § 127(a)(1), which effectively amended the Comprehensive Environmental Response, Compensation and Liability

Act ("CERCLA"), 42 U.S.C. § 9601 *et seq.* The amended provision provided that an entity which "arranged for recycling of recyclable material shall not be liable" for cleanup at a recycler's site. *Id.* at § 127(b). The four appellants argued to the Appellate Court that the SREA shielded them from liability for contribution to Gould.

The Appellate Court held that Congress intended the SREA to apply retroactively to judicial actions initiated by private parties prior to November 29, 1999, if they were still pending on that date. They further held that Gould's contribution claims against the named appellants met those criteria.

The Court went on to hold that the SREA applied to Gould's claims. The Court further held that this Court's Order of September 4, 1997 granting summary judgment to Gould on the issue of contribution liability and allocating liability was vacated. The Appellate Court then remanded the case to this Court to determine whether the appellants have satisfied the SREA's requirements for exemption from liability. *See Gould Inc. v. A & M Battery & Tire Service,* 232 F.3d 162.

After the matter was remanded, we directed the parties to brief the issues that remained before this Court. The parties entered into certain agreements concerning the status of each party. Indeed, Plaintiff Gould settled with one of the four appellants, leaving three remaining in this action.[1] The parties also entered into agreements and stipulations which narrowed the issue even further before this Court.

---

1. Alexandria Scrap Corporation, Lake Erie Recycling Company and R & R Salvage Company

The issue submitted to this Court is whether the remaining Defendants are exempt from contribution liability under the SREA, and whether they meet the criteria set forth in the SREA. The Plaintiff argued that the remaining Defendants are not exempt from contribution liability under the SREA because they do not meet the criteria set forth in the SREA. One section of the SREA that is brought into question by this action is § 127(f)(1)(A)(iii). Section 127(f)(1)(A)(iii), as applied to this case, essentially states that parties would not be exempt under the SREA if they knew or reasonably should have known that the battery crushing operation, where they forwarded their batteries, was not being operated in conformity with the environmental laws in existence at the time the batteries were shipped.

The remaining three Defendants continue to argue that they are exempt parties under the SREA, because they did not have knowledge of certain conduct of the operators of the battery crushing business at the Marjol battery site.

We determined in our Order of October 31, 2001, that because operative facts were in dispute based on the record it was necessary to schedule a hearing [2] and take testimony from appropriate witnesses to resolve these matters. (Doc.2080).

At the November 15, 2001 hearing held on this matter both parties presented witnesses, read deposition testimony into the record and presented argument.

### III

There are several distinct standards that we must keep in mind when disposing of this motion and this case. We will address them in detail below. The most obvious standard we will apply is that of summary judgment. The second is the standard set forth in CERCLA § 127(f)(1)(A)(iii) directing us about the Objectively Reasonable Basis to Believe standard regarding the knowledge of contributors. Finally, underlying these standards we must bear in mind that the burden of proof is on the Plaintiff to show that it has a viable claim to take to trial.

The burden of proof essentially is the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court. Burden of proof is a term which describes two different concepts; first, the "burden of persuasion", which under traditional view never shifts from one party to the other at any stage of the proceeding, and second, the "burden of going forward with the evidence", which may shift back and forth between the parties as the trial progresses. *Ambrose v. Wheatley*, 321 F.Supp. 1220, 1222. In this case, both concepts of burden of proof are present.

We note initially that a motion for summary judgment can be a very powerful motion. It is a legal method of totally resolving a case without a trial based on a review of pleadings and submissions of the parties. Granting summary judgment is appropriate in cases where there are no significant facts in dispute. But, because of the finality of granting a summary judgment motion, we must carefully examine the case and supporting documents along with the submissions from the Plaintiff who hopes to keep his case alive. Rule 56 is a mechanism for "asses[ing] the proof in order to see whether there is a genuine

---

**2.** Rule 43. Taking of Testimony.

. . . . .

(e) Evidence on Motions. When a motion is based on facts not appearing of record the court may...direct that the matter be heard wholly or partly on oral testimony or deposition.

need for trial." Fed.R.Civ.P. 56(e) advisory committee's notes (amended 1963). While summary judgment is somewhat controversial and can be seen as upsetting the precarious balance between expediency and the preservation of our Seventh Amendment[3] rights we are vigilant and careful not to use it to preclude a parties' right to trial, rather as a vehicle to simply to move their case more quickly through an increasingly less efficient judicial system.[4]

We follow considerable guidance in determining whether summary judgment should be granted. Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Knabe v. Boury,* 114 F.3d 407, 410 n. 4 (3d Cir.1997) (*citing* Fed.R.Civ.P. 56(c)). "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–8, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). *See also Orsatti v. New Jersey State Police,* 71 F.3d 480 (3d Cir.1995).

These rules make it clear then, that in order for a moving party to prevail on a motion for summary judgment, the party must show two things: (a) that there is no genuine issue as to any material fact, and (b) that the party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). This instructs us that a fact is "material" if proof of its existence or nonexistence would effect the outcome of the lawsuit under the law applicable to the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Levendos v. Stern Entertainment Inc.,* 860 F.2d 1227, 1233 (3d Cir.1988). We are further instructed that an issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Anderson,* 477 U.S. at 257, 106 S.Ct. 2505; *Hankins v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987); *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir.1987); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* rev'd 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Under this regimen that we follow, the Court is required to view the evidence in the light most favorable to the non-moving party. Consistent with this principle, the non-movant's evidence must be accepted as true and all reasonable inferences must be drawn in the non-movant's favor. *J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1531 (3d Cir.1990). However, the non-moving party may not rest on the bare allegations contained in his or her pleadings. Once the moving party has satisfied its burden of identifying evidence which demonstrates an absence of a genuine issue of material fact, *see Childers v. Joseph,* 842 F.2d 689, 694 (3d Cir.1988), the nonmoving party is required by Federal Rule of Civil Procedure 56(e)[5] to go

---

**3.** Amendment VII. In Suits at common law, where the value in controversy shall exceed twenty dollars, the rights of trial by jury shall be preserved, and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.

**4.** For more on this topic, see *A call for introspection Summary Judgment: Use or Abuse,* by Alan B. Epstein.

**5.** In relevant part, Rule 56(e) states:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere

beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corporation v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial. *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.,* 812 F.2d 141, 144 (3d Cir.1987).

In 1986, the Supreme Court handed down a trio of opinions that significantly altered the playing field relating to the disposition of summary judgment motions in our federal courts. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* rev'd 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Those cases encouraged greater use and acceptance of summary judgment motions and decreased the moving party's burden on issues where the opposing party bears the burden of proof. The jurisprudence of this significant "trilogy" made it possible for defendants to challenge the factual sufficiency of plaintiff's claims without any affirmative evidence of their own. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

In *Celotex,* the Court held that the moving party can discharge his initial burden simply by showing that the non-moving party has not produced any evidence in support of an element on which the movant will bear the burden of proof at trial.

Once the movant shows that no evidence has been produced, the burden then shifts to the non-moving party to produce evidence suggesting he will be able to carry his burden at trial. *Id.* at 323–24, 106 S.Ct. 2548. While admonishing that "Rule 56 must be construed with due regard...to have...claims and defenses tried at jury," it also noted that courts should not hesitate to grant summary judgment in appropriate circumstances. *Id.* at 327, 106 S.Ct. 2548.

In *Matsushita,* the Court reversed the decision of the Third Circuit and held that the existence of competing inferences will not preclude the grant of a summary judgment motion. Under the standard established in *Matsushita,* if a party moving for summary judgment can show that the inference supporting its position is the only "reasonable" inference, then summary judgment is proper. *Id.* 475 U.S. at 588, 106 S.Ct. 1348.

Thirdly, in *Anderson v. Liberty Lobby, Inc.,* the Court held that to determine if the opponent's evidence is sufficiently probative, the trial judge must consider the nature of the actual quantum and quality of proof necessary to support liability. *Id.* 477 U.S. at 254, 106 S.Ct. 2505. Therefore, the higher the proof at trial, the more probative evidence necessary to defeat a summary judgment motion. (See also *Orsatti v. New Jersey State Police,* 71 F.3d 480, 484 (3d Cir.1995).).

Finally, it has been held that the plaintiff/non-moving party, must do more than simply show that there is some meta-physical doubt as to those material facts; they must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd.*

---

allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

*v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The Third Circuit Court of Appeals has also determined that "a plaintiff must point to concrete evidence in the record that supports each and every essential element of his case to survive summary judgment." *Orsatti v. New Jersey State Police,* 71 F.3d 480, 484.

Thus, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, when conflicting evidence must be weighed, a full trial is usually necessary. Such disputes are not appropriately resolved on the basis of affidavits alone. Witnesses should be heard and observed, on direct and cross-examination. But when the question for decision concerns drawing inferences from undisputed evidence, or interpreting and evaluating evidence to derive legal conclusions, a trial may not add to the Court's ability to decide.

In this case, the existing record was chock full of deposition testimony, prior trial testimony and hundreds of pages of argument submitted by both parties. In spite of this voluminous record, we note the evidence of record was created prior to the change in CERCLA, and because of the nature of this case and the change in the law, we were faced with a situation where hearing witnesses and testimony in order to develop the record further was needed. Therefore, a limited evidentiary hearing was held for this purpose pursuant to Fed.R.Civ.P. 43(e).

Regarding the SREA, the burden of proof is on the "persons who arranged for the recycling of spend lead-acid batteries"

to prove (1) the recyclable material met a commercial specification grade, CERLA § 127(c)(1); (2) a market existed for the recyclable material, CERCLA § 127(c)(2); (3) a substantial portion of the recyclable material was made available for use as feedstock for the manufacture of new saleable product, CERCLA § 127(c)(3); (4) the recyclable material could have been a replacement or substitute for a virgin raw material, CERCLA § 127(c)(4); (5) the person arranging for the recycling "did not recover the valuable components of such batteries," CERCLA § 127(e)(1); and (6) the person was in compliance with applicable Federal environmental regulations regarding the storage, transport, management, or other activities associated with the recycling of spent lead-acid batteries, CERCLA § 127(e)(2)(A). Gould has stipulated that the Defendants have met each of these tests which were established to identify protected *bona fide* recycling transactions. Because of Gould's stipulation, the burden of proof has shifted from the Defendants to Gould to prove the existence of several "Exclusions" set forth in CERCLA § 127(f)(1) and discussed *infra.*

## IV

### *DISCUSSION*

Our research determined there are few cases that have addressed this aspect of the SREA.[6] It appears at first glance that the SREA provides a blanket exemption of liability to recyclers supplying batteries to breaking facilities. Further reading of the amendment shows the analysis is more complicated.

---

**6.** In their brief, Defendants cite to *U.S. v. Mountain Metal Co., et al.,* 137 F.Supp.2d 1267 (N.D.Ala.2001) (In that case the court determined that the actions of a battery recycler who did business with a buyer after obtaining actual knowledge of potential problems at the buyer's site during the 1990s did not give rise to an objectively reasonable basis on the part of the scrap recycler to believe that the buyer's site was not in compliance with the environmental laws thereby implicating an exclusion). (Doc.2079).

The SREA contains a narrow test to determine if a party is exempt or not. The SREA established a four-part test to identify SREA-protected *bona fide* recycling transactions. *See* 42 U.S.C. § 9627(e)(1), incorporating § 9627(c)(1)-(4).[7] One of the stipulations made by Gould was that the Defendants have met each part of the four-part test under the SREA. (Doc.2081). In addition, the SREA requires that the recycling defendant establish that the person arranging for recycling "did not recover the valuable components of such batteries," CERCLA § 127(e)(1); and the person was in compliance with applicable Federal environmental regulations regarding the storage, transport, management, or other activities associated with the recycling of spent lead-acid batteries, CERCLA § 127(e)(2)(A). The Plaintiff stipulated to these requirements, as well. (Doc.2081). Some recycling contributors are not protected by the Act because the Act includes certain exclusions. The Act also places the burden of proof on the party claiming a contribution is excluded from coverage.

The remaining issue before us, which is the subject of the Defendant's motion for summary judgment, is whether one or more of the exclusions from the SREA's protection of recyclers apply to the Defendants. If we find one or more exclusions apply then we can impose liability on the Defendant(s) notwithstanding their transactions meet the *bona fide* recycling test established by Congress in the SREA.

█ Thus, once a recycler defendant has established it is covered by the *bona fide* recycling criteria, the burden of proof

shifts to the site operator (plaintiff) to prove the existence of several "Exclusions" set forth in CERCLA § 127(f)(1). Here, because the *bona fide* recycling criteria have been stipulated, Gould the Plaintiff, has the burden of proving Defendants are excluded from coverage under the Act. The five exclusions are:

(1) the recycling defendant had an objectively reasonable basis to believe that the batteries would not be recycled, CERCLA, § 127(f)(1)(A)(i);

(2) the recycling defendant had an objectively reasonable basis to believe that the recyclable material would be burned as fuel, or for energy recovery or incineration, CERCLA § 127(f)(1)(A)(ii);

(3) the recycling defendant had reason to believe that hazardous substances had been added to the recyclable material for purposes other that processing for recycling, CERCLA § 127(f)(1)(B);

(4) the recycling defendant failed to exercise reasonable care with respect to the management and handling of the recyclable material, CERCLA § 127(f)(1)(C); and

(5) the recycling defendant had an objectively reasonable basis to believe at the time of the recycling transaction that the consuming facility [here, Marjol/Gould] was not in compliance with substantive (not procedural or administrative) provisions of the environmental laws, CERCLA § 127(f)(1)(A)(iii).

In this motion for summary judgment, as we have pointed out, we focus on exclusions four and five above, as the Plaintiff has stipulated that it has no evidence on the first three exclusions. (Doc.2081).

7. The four *bona fide* recycling factors are: (1) the recyclable material met a commercial specification grade, CERCLA § 127(c)(1); (2) a market existed for the recyclable material, CERCLA § 127(c)(3); (3) a substantial portion of the recyclable material was made available for use as feedstock for the manufacture of a new saleable product, CERCLA § 127(c)(3); and (4) the recyclable material could have been a replacement or substitute for a virgin raw material, CERCLA § 127(c)(4).

## V

### DEFENDANTS' ARGUMENT

The Defendants argue that the stipulations entered into by the parties show that they are proper parties exempted under the SREA and that the burden of proving that they knew or reasonably should have known that the battery crushing facility was not being properly operated, falls on Gould and that Gould can produce no proof to show otherwise. Therefore, they argue Gould is unable to show that the Defendants do not meet the exempt status. The Defendants note in their trial brief (Doc. 2081) that the "SREA places the burden of coming forward with proof on these exclusions with Gould. SREA Legislative History, 145 Cong. Rec. S15048, S15050 (daily ed. Nov. 19, 1999)('[T]he burden is on the government or other complaining party to demonstrate the criteria specified in section 127(f).')."[8] They further claim that Gould cannot show that the Defendants knew or reasonably should have known about the procedures at the battery crushing operation during the 1970s when batteries were shipped to that site. (Doc. 2066).

The Defendants presented testimony from Stanley Asrael, Howard Goldman, and Richard Redino at the November 15, 2001 hearing in addition to reading deposition testimony into the record. The Plaintiff presented testimony from Anthony Bonadio.

### PLAINTIFF'S ARGUMENT

In their effort to show Defendants "knew or should have known" the Plaintiff points to the SREA requirements that this Court consider (1) the sophistication and size of the Defendants businesses; (2) customary industry practice; (3) whether Marjol paid above market price for the batteries; and (4) how much effort would it have taken for the Defendants to discover Marjol's violations. The Plaintiff asserts that "[a]pplying this four part test to the record in this case shows that the defendants clearly had an objectively reasonable basis to believe Marjol was not in compliance with environmental laws." (Doc.2071, p. 2).

The Plaintiff further argues that the evidence of record clearly suggests that the last two exclusions in the CERCLA § 127 may be implicated by the Defendants' conduct: (1) whether Defendants had an objectively reasonable basis to believe at the time of the transaction(s) that Marjol was "not in compliance with a substantive (not procedural or administrative) provision of and Federal, State or local environmental law or regulation, or compliance order or decree issued pursuant thereto, applicable to the handling, processing, reclamation, or other management activities associated with recyclable material";[9] and (2) whether Defendants "failed to exercise reasonable care with respect to the management and handling of the recyclable material (including adhering to customary industry practices current at the time of the recycling transaction designed to minimize, through source control, contamination of the recyclable material by hazardous substances)."[10]

---

**8.** We find that this point is consistent with established law on the burden of proof with respect to statutory exceptions. *See O'Shea v. Amoco Oil Co.,* 886 F.2d 584, 593, 597 (3d Cir.1989) (once the party asserting that a statutory provision applies has satisfied its burden, the burden shifts to the party opposing application of the statute to show that an exception preventing application of the statute should apply).

**9.** CERCLA § 127(f)(1)(A)(iii), 42 U.S.C. § 9627(f)(1)(A)(iii).

**10.** CERCLA § 127(f)(1)(C), 42 U.S.C. § 9627(f)(1)(C).

■ The Plaintiff's position regarding number 2, above is that the exclusion creates a general "reasonable care" standard to apply to every part of the recycling transaction. On the other hand, the Defendants posit that the Plaintiff's interpretation is incorrect because to interpret it like that would subsume the "objectively reasonable basis to believe" exclusion and render it superfluous. The Defendants argue that the legislative history makes clear that the " *'objectively reasonable basis for belief' standard 'is not equivalent to the reasonable care standard.'* Legislative History of SREA, 145 Cong. Rec. S15049, S15050." (Doc.2081, p. 7). According to the Defendants, "the standard 'is meant to be a more rigorous standard' than the simple negligence standard." (*Id.*). Based on the language of the statute and the record, we agree with the Defendants on this matter and therefore reject the notion that a ordinary reasonable negligence care standard be applied to all aspects of the recycling transaction.

Regarding number 1, above, the Plaintiff claims that Marjol paid above market price, and "[t]hat [f]act [s]hould [h]ave [r]aised a [r]ed [f]lag for Defendants." (Doc.2082, p. 7). Plaintiff claims that this is an objectively reasonable basis to believe that Marjol was not in compliance with environmental laws.

Furthermore, the Plaintiff argued that the "Defendants were sophisticated major players in the scrap battery supplying business who, unlike smaller players, knew in the 1970s that lead was toxic." (Doc. 2071, p. 2). The Plaintiff claimed that the SREA does not allow a "sophisticated participant in the scrap battery industry to simply bury its head in the sand and play dumb in order to avoid liability." (*Id.*). Plaintiff claims that because the Defendants were sophisticated competitors in their business it is more likely that they

had an objectively reasonable basis to believe Marjol was not in compliance. (*Id.* at 10).

Further, Plaintiff argues generally that there is evidence that suppliers made inquiries to Marjol. (Doc.2082). Prior trial testimony bears this out. (*See* Bonadio Testimony, pp. 38–39, 4/29/97). However, the record does not support that any of the remaining Defendants made inquiries to Marjol about their compliance with environmental regulations. In addition, Plaintiff claims that the Defendant were also aware that Marjol was "paying above market prices, even though Marjol had significant transportation costs." *Id.*, and that this was a sign that Marjol must not be in compliance with environmental regulations.

### NOVEMBER 15, 2001 HEARING

■ At the November 15, 2001 hearing before this Court testimony was presented regarding the sophistication and size of the Defendants businesses, customary industry practices, the price Marjol paid for scrap batteries, and how much effort would have been needed for the Defendants to discover Marjol's environmental violations. We will examine the testimony for each in turn.

1. Sophistication and Size of the Defendant Businesses.

According to the Plaintiff, the size of Defendants businesses was enough to allow them to make an extensive investigation into the nature of the people with whom they did business. The largest of the Defendants companies had 20–30 employees, but testimony shows that they were not major industrial or business endeavors, but were really family operations that had limited extra personnel to do extensive investigations.

### A. Alexandria Scrap Corporation.

According to Stanley Asrael, President and Treasurer of Alexandria Scrap Corporation, Alexandria Scrap Corporation ("Alexandria") was [11] primarily a ferrous scrap operation that dealt mostly with iron and steel as opposed to a non-ferrous scrap operation. (Notes of Testimony from November 19, 2001 hearing cited as "N.T. at "), (N.T. at 160). Asrael explained that non-ferrous scrap included "copper and its alloys, aluminum and their alloys, lead and their alloys." (*Id.*). In the 1970s, Asrael was the president, treasurer and sole stockholder, and his wife was vice-president and secretary. (N.T. at 160–61). Batteries "were a tiny part" of Alexandria's business. (N.T. at 166).

### B. Lake Erie Recycling Company

According to Howard Goldman, General Manager of Lake Erie Recycling ("Lake Erie"), formerly the president, Lake Erie was a family business started by his father. (N.T. at 184). Lake Erie primarily dealt with non-ferrous metals with five percent of their business involving batteries. (N.T. 185–86). Lake Erie was not very large nor sophisticated. Goldman testified they had six or eight employees in the 1970s at their one location in Buffalo, New York. (N.T. 186).

### C. R & R Salvage Company

Richard Redino, vice-president, testified on behalf of R & R Salvage ("R & R"). According to Redino, R & R was primarily a ferrous operation with some non-ferrous aspects as well. (N.T. at 211). In the 1970s R & R had about twenty employees at one location. (*Id.*). R & R was run by Redino's father and uncle from the early 1960s to the early 1990s. Their non-ferrous business was between twenty and thirty percent of gross revenues in the 1970s. Of their gross revenues, batteries made up "[l]ess than 1 percent." (N.T. at 212).

We conclude, based on the testimony, that none of the Defendants were large or sophisticated operations. To the contrary, they were small family run operations with limited resources for extraneous activities such as researching buyers.

### 2. Customary Industry Practice.

The Plaintiff showed through Anthony Bonadio's testimony that many potential and actual battery sellers came to the Marjol site to tour the facility and that they made telephone inquiries regarding its operations. According to prior testimony read into the record, Bonadio recalled giving approximately fifty suppliers a tour of the Marjol site. (N.T. at 25). Bonadio was a manager at the Marjol site in the 1970s. (N.T. at 22). However, Bonadio also testified that if people had gone to the site or called that would have resulted in them being told that it was a first-class operation and all efforts were being made to comply with the ever-changing environmental regulations at the time. Any calls to governmental agencies would have revealed that while some of the agency representatives were not satisfied with the way Marjol was operating the crushing site, the site in fact, was never closed down and the operators would argue that they were continually striving to run a proper facility. Finally, Bonadio does not remember ever giving a tour of the site to any of the three remaining Defendants. (N.T. at 36–37).

---

**11.** Alexandria ceased business operations in 1989 and is a "holding company...looking forward to dissolving itself." (N.T. 158).

The Plaintiff presented argument claiming because Marjol sent trucks quite some distance to pick up batteries from the Defendants, that this somehow shows that they were cutting corners elsewhere, namely, environmental controls. The record does not support this argument.

Testimony from Asrael, Goldman and Redino reveals that the buyer pick up service furnished by Marjol/Gould was standard in the industry at that time and that that service, when done promptly, was considered when choosing a buyer for scrap batteries. (N.T. at 163–65, 187–89, 213–14).

### 3. Price.

Testimony from Bonadio and the record does indicate that Marjol paid *slightly* higher for scrap batteries, but based on the Defendant's testimony and the record, we find that the difference is insignificant. (N.T. at 164). Defendant Stanley Asrael of Alexandria testified that Marjol did pay a fraction of a cent higher than other recyclers in the area at times, but that it was not enough for him to think that something was amiss. (N.T. at 164). The Plaintiff claimed that the relative price that Marjol paid for batteries compared to the "Average Buyer" were significantly higher. The Court notes that the "Average Buyer" was based on the AMMD battery price, not necessarily the average price paid in Marjol's area or region. Because the national average does not necessarily reflect the regional average or regional fair market price, the evidence is not convincing. In fact, testimony revealed that it was Marjol's outstanding customer service rather than it's price that kept the Defendants coming back to Marjol and convinced them of Marjol's proper facility operations. (N.T. at 164, 188–89, 214). The Plaintiff claims the price paid by Marjol was so high that it should have

"raised a red flag." In past determinations we found that the price was indeed somewhat higher than the market price. But, it was clear from testimony that the Defendants looked at the price paid to them as including more than just the cost per pound, and also included excellent service. Marjol always paid on time and this was very important, especially for the smaller recyclers. Ultimately, the slight per pound difference in price was a small issue among the various battery crushers.

### 4. Ability to Detect Marjol's Noncompliance.

The Plaintiff submitted numerous articles from trade magazines, and newspapers suggesting that based on them, anyone in the battery recycling industry must have known that Marjol was not in compliance with substantive environmental laws at that time.

Testimony from Asrael, Goldman and Redino failed to reveal that any of the Defendants read or was persuaded by any of these articles. (N.T. at 179–80, 192–93, 203–06, 218). Plaintiff claims the Defendants should have gone to the site, seen articles in trade journals and newspapers, and checked with agencies regarding Marjol's status, however they failed to show any obligation on the Defendants to do any of these things, or that such conduct would have been reasonable at the time. In fact, Plaintiff's testimony shows that a call or visit to Marjol would have revealed that they are doing their best to stay in compliance and that they are running a first-class operation. (N.T. at 40–41). Any other investigation at that time in the 1970s was limited because there was little concern anywhere about environmental contamination especially by batteries and lead. (N.T. 192–93, 216).

## CONCLUSION

We must balance the reality of the testimony in the light most favorable to the Plaintiff with the fact that the Legislation was passed to inspire more recycling not to curb it, and to protect those involved in recycling who had no reason to believe that they were doing something improper at the time. Doing so, we must conclude that not only did the Plaintiff fail to carry its burden of proof at the hearing on November 15, 2001, but the testimony and written submissions show the Plaintiff cannot meet its legal burden under the SREA to show that the Defendants are not exempt. Therefore, we must find that the Defendants are entitled to exemption under the act and entitled to judgment in their favor. An appropriate order follows.

## ORDER

NOW, this 27th Day of December, 2001, it is hereby ORDERED that:

1. Defendant's motion for Summary Judgment (Doc.2065) is GRANTED;

2. The Clerk of Court is directed to enter judgment in favor of the Defendants, Alexandria Scrap Corporation, Lake Erie Recycling Company and R & R Salvage Company and against the Plaintiff, Gould, Inc.;

3. The Clerk of Court is directed to close this case.